662 So.2d 648 (1995)
LEAF RIVER FOREST PRODUCTS, INC., Great Northern Nekoosa Corporation and Georgia-Pacific Corporation
v.
Thomas Dixon FERGUSON, Jr. and Bonnie Jane Ferguson.
No. 92-CA-00387-SCT.
Supreme Court of Mississippi.
October 19, 1995.
*650 Lee Davis Thames, Butler Snow O'Mara Stevens & Cannada, Jackson, W. Wayne Drinkwater Jr., Lake Tindall & Thackston, Jackson, Joe Sam Owen, Owen Galloway & Clark, Gulfport, for Appellant.
John M. Deakle, Hattiesburg, Patrick W. Pendley, Plaquemine, LA; Lawrence E. Abernathy, III, Laurel, Curtis R. Hussey, Hattiesburg, for Appellee.
Luther T. Munford, Phelps Dunbar Firm, Jackson, Carlton W. Reeves, Jackson, John H. Price, Jr., Price & Zirulnik, Jackson, for Amicus Curiae.
EN BANC.
PITTMAN, Justice, for the Court:
Eleven plaintiffs sued Georgia-Pacific Corporation, Great Northern Nekoosa Corporation, Leaf River Corporation, and Leaf River Forest Products, Inc., in Jackson County Circuit Court, alleging that the defendants had, through operation of the Leaf River Paper Mill, discharged harmful substances into the Leaf and Pascagoula Rivers, thereby causing the plaintiffs personal injury and property damage. After filing two amended complaints the three remaining plaintiffs were Thomas Ferguson, Jr., his wife, Bonnie Jane Ferguson, and Louise H. Mitchell. After a trial the jury found in favor of the appellants, Leaf River Forest Products, Inc., et al. as to all of the claims made by the appellee, Louise H. Mitchell. Further, the jury found in favor of the appellants, Leaf River Forest Products, Inc., et al. as to any trespass committed against the appellee's property by the placing of any foreign substance on the said property. The jury did award the Fergusons $10,000.00 each on their nuisance claim; $90,000.00 each on their emotional distress claim; and $3,000,000.00 in punitive damages. After consideration of the briefs, a voluminous record and oral argument, we find that the evidence is insufficient to support verdicts based either on infliction of emotional distress or nuisance. Accordingly, we reverse and render judgment in favor of the defendants/appellants.

THIS COURTS FINDINGS
We have before found that emotional distress inflicted either negligently or intentionally is compensable. However, emotional distress based on the fear of a future illness must await a manifestation of that illness or be supported by substantial exposure to the danger, and be supported by medical or scientific evidence so that there is a rational basis for the emotional fear. We do not harm and, in fact, preserve a recovery for emotional distress when the same is based on such a foundation. We, therefore, reverse and render any award made based on emotional distress caused by a future illness and allow the claimants to await a manifestation of such future illness.
We find as to nuisance that there is little evidence and scarce testimony of any invasion by substance or odor by the defendants as to the appellants specific property. Without such there can be no nuisance.

PROCEDURAL HISTORY
In 1984 the Leaf River Paper Mill began operation in New Augusta, Perry County, Mississippi. The mill is located on the Leaf River, which eventually combines with the Chickasawhay River to form the Pascagoula River. The mill processes timber into a paper pulp product for domestic and foreign sale. In 1985 2,3,7,8-tetrachlorodibenzo-p-dioxin ("dioxin"), a toxic substance, was detected in the sludge, or solid waste material, produced by certain paper mills in Maine. It was subsequently determined that this type of dioxin was a by-product of the pulp-making process, particularly resulting where chlorine was used to bleach pulp to make it whiter. Dioxin was eventually found in the effluent, or waste water, and sludge produced by the Leaf River mill. Testing for dioxin was subsequently performed on fish caught in the Leaf River. As a result of these tests the Mississippi Department of Wildlife and Fisheries closed the Leaf, Pascagoula and Escatawpa Rivers to commercial fishing from October 1990 to January 1991, and issued consumption advisories for fish caught from the Leaf and Pascagoula Rivers. The consumption advisory for the Pascagoula *651 was lifted in December 1990, but remained in effect for the Leaf River.
On March 1, 1991, eleven plaintiffs, including Thomas Ferguson, Jr., his wife, Bonnie Jane Ferguson, and Louise H. Mitchell filed suit in Jackson County Circuit Court against Leaf River Forest Products, Inc.; Warren Richardson; Acker Smith; Great Northern Nekoosa Corporation; and Georgia-Pacific Corporation. The plaintiffs alleged that the defendants, through the operation of the Leaf River mill, had discharged toxic chemicals into the Leaf River, causing injury to the plaintiffs, who lived along the Pascagoula River. The complaint was based on negligence, strict liability, nuisance and trespass. The plaintiffs alleged that they had suffered emotional distress and were entitled to actual and punitive damages totaling approximately $560,000,000.00. Louise Mitchell's property was located approximately one hundred miles down river from the mill; the Fergusons' property was approximately one hundred twenty-five miles downriver from the mill.
Defendants answered and denied the allegations of the plaintiffs, raising several affirmative defenses. Plaintiffs' first amended complaint was filed on July 30, 1991. The amended complaint added Leaf River Corporation as a defendant. The defendants admitted that Leaf River Forest Products operated the mill; that Leaf River Forest Products was a wholly owned subsidiary of Leaf River Corporation; that Leaf River Corporation was a wholly owned subsidiary of Great Northern Nekoosa Corporation; and that Great Northern Nekoosa Corporation was a wholly owned subsidiary of Georgia-Pacific. Trial began on January 7, 1992.

PLAINTIFFS/APPELLEES
Thomas Ferguson, Jr., was born in Georgia but had lived in south Mississippi since 1945. In 1960, Ferguson purchased fifteen acres of land on the Pascagoula River. He cleared the land and built bayous, two boat sheds, a house, a bait shop and a trailer park. He had hoped to leave the property to his son. He stated that he could no longer swim or fish in the river and he had developed a fear of cancer, as he had eaten large amounts of fish caught in the Pascagoula before knowing about the dioxin problem. Ferguson also stated that his property had flooded several times recently and this had worsened his fear that his property was contaminated with dioxin.
Ferguson testified that if he had known that the mill was discharging dioxin into the river, he would have made "different arrangements with [his] lifestyle." He had first noticed the river water getting darker in 1986-87. Ferguson had seen Dr. Charlton Stanley, a psychologist, and Dr. Donald Guild, a psychiatrist, but had not taken the medicine prescribed for him. He had not been informed of any kind of evaluation or diagnosis until his pretrial deposition was taken. Ferguson had not had his property or his well water tested for dioxin, and had not tried to sell his property. He had not had his blood tested for determination of dioxin levels. Ferguson had a separate fear of cancer claim in asbestos-related litigation, and he had been tested in connection with that particular claim.
Bonnie Jane Ferguson, wife of Thomas Ferguson, Jr., was born and raised in south Mississippi. She was a housewife and she also ran their marina, which included collecting the rent and keeping the records of the rent money. She stated that over the past few years the river had gotten darker, a light coffee color, and the fish did not bite like they once had. She had first noticed the change in the color of the river in 1985. Her greatest sense of loss came from the belief that the property she and her husband had planned to leave to their son was now worthless. She had declined Leaf River's offer to pay for her blood to be tested, stating that if dioxin was in her system and could not be removed she did not want to know about it. She claimed to have developed a fear of cancer because of the large amount of catfish she had eaten which had been caught in the Pascagoula. The fear was not something that paralyzed her or kept her from functioning.
We must note a lack of evidence as to substance on the Ferguson's property or dioxin in their body. The Fergusons testify only to a mental fear, a fear without foundation in fact.

*652 OTHER RIVER RESIDENTS
O.V. Stringer had been fishing and camping on the Pascagoula River since 1940. Stringer had first noticed a change in the color of the Pascagoula in 1990. He had also noticed that the sandbars were copper or dark tea-colored from where the water had settled on them, and that the water had turned the color of dark, strong tea. He had also noticed in 1987 a decline in the fishing quality of the river. He particularly noticed a scarcity of catfish and a large quantity of dead mussels. Stringer agreed that he was also suing Georgia-Pacific, that members of his family were also dioxin plaintiffs, and that Mr. Deakle, lead counsel for the Fergusons, was his attorney.
Kenneth McGuire had come to south Mississippi from Kansas in 1959 for military service and had settled on the Pascagoula. He and his wife had owned a fishing camp on the Pascagoula for twelve years. McGuire noticed a change in the river color in 1985 or 1986. He stated that the river at that time was "about the consistency and the color of Tang drink" for about three or four weeks and there had been a fish kill. He said that the river had become darker over recent years and had developed a fibrous consistency. There were fewer fish being caught and some of those being caught had open sores. McGuire testified that he was a plaintiff in the dioxin litigation against Georgia-Pacific and that he had "a financial interest in the outcome of this case and the litigation in general."

APPELLEES' EXPERTS
Dr. Arnold Schecter, physician and professor of preventative medicine at the State University of New York, Binghamton, referred to 2,3,7,8-tetrachlorodibenzodioxin, or dioxin, as a "super toxin," because a very tiny amount would produce increased ill effects in an animal. Schecter testified that dioxin was fat-soluble, that it could enter the body through breathing, ingestion or through contact with the skin; that the dioxin in food that was eaten and not eliminated through waste would be absorbed into the bloodstream and throughout the body's organs; and that dioxin was a persistent compound, with an estimated half-life of seven years. Schecter testified that studies showed that human health effects resulting from exposure to dioxin included several different cancers; malformation and death of unborn children; weakening of the immune system; liver damage; lipid alteration; damage to the central nervous system; skin rashes; and learning disabilities. Schecter felt that there was no doubt that dioxin caused cancer in humans. He had visited with the appellees for less than an hour before trial and had reviewed a number of fish studies performed by the State of Mississippi as well as medical and psychological tests concerning the appellees. He stated that he felt that, based on a reasonable degree of medical probability, the appellees' fear of developing cancer from eating fish from the Pascagoula River was reasonable. Schecter agreed that a comprehensive medical evaluation, including blood tests, was the best method of determining exposure to dioxin, and stated that he had his own blood and fat tested for dioxin after he became involved with a chemical cleanup in Binghamton, New York. He could not say that the appellees' health was actually at risk because of their exposure to dioxin. He also did not know the level of dioxin in the appellees' bodies, either before or after their alleged exposure due to eating fish from the river.
Dr. Arthur Hume, a member of the Department of Pharmacology and Toxicology at the University of Mississippi, was accepted as an expert in toxicology and chemistry. Hume testified that tests had shown that dioxin had a harmful effect on all the different systems in a mammal's body, with the most notorious effect being its ability to damage the immune system. Recent toxicological evidence had convinced Hume that dioxin was a human carcinogen, and Hume also believed that appellees, who had eaten fish from the Pascagoula River, had a reasonable basis for fear of an increased chance of contracting cancer. Dr. Hume agreed that no one could know the level of dioxin in the fish eaten by the appellees, however he maintained that it was probable that the fish had dioxin in them. Hume also agreed that the best way to measure increases in dioxin levels *653 after exposure was to take fat or blood samples and test them.
Dr. Walter Roberts, a veterinarian and aquatic scientist who had taught in the Departments of Environmental Health and Natural Science at Mississippi Valley State University, had gone to the Leaf River, apparently in 1991, and had caught an unknown number of catfish specimens which he later checked for parasites and bacterial infections. Dr. Roberts found that some of the fish he had caught had lesions on them. His opinion was that the lesions were caused by chemical stress, and he did not find any lesions on fish caught above the mill. Dr. Roberts did not know what chemical had induced the stress in these fish, and he did not claim that dioxin or anything produced by the mill was at fault.
Dr. Charlton Stanley, a psychologist, was admitted as an expert in the field of human psychology and particularly in the area of human psychological effect of environmental disasters. Dr. Stanley had seen the Fergusons on May 13, 1991. He interviewed them jointly, and took a history. He found that the Fergusons' primary fear besides contracting cancer was not being able to leave something of value, their property, to their son. Stanley believed that the Fergusons suffered from an adjustment disorder. He believed that the Fergusons' fears and distress were genuine and reasonable under the circumstances. Dr. Stanley had not informed the Fergusons of his findings concerning them and it was his understanding that they had not sought any follow-up psychotherapy or counseling.
Guy Blankinship was accepted as an expert in the field of real estate appraisal. Blankinship based his appraisal of the Ferguson property, totaling approximately 14 acres, on 6.1 acres facing the Pascagoula. He estimated a market value of $12,000.00 per acre, for a total of $73,200.00, and stated that the diminution in value of the property due to the presence of dioxin in the Leaf River and the stigma involved with the river was $65,000.00. Blankinship did not know whether dioxin was actually on the Fergusons' property. He had recommended to them that they have the property tested, but they had not tested the property.

TESTING FOR DIOXIN
As the Fergusons did not have themselves or their property tested for the presence of dioxin, they relied on tests of wildlife in the area of the Leaf River to support their claims of emotional distress and nuisance. Appellants used the same test results in an effort to repudiate these claims. The testing took place from 1988 to 1990. The majority of the test results dealt with fish caught in the vicinity of the Leaf River mill. The earlier results showed detectable levels, in parts per trillion or quadrillion, of dioxin in fish caught on the Leaf River. Some of the later results showed a reduction of dioxin levels in the fish tested. None of the testing of fish took place in the vicinity of the Fergusons' property. The testing sites closest to the Fergusons' property were at Merrill, approximately eighty miles upriver from the Fergusons.

GEORGIA-PACIFIC PERSONNEL
Warren Richardson, general manager of the Leaf River mill, had on-site responsibility for its operation. Richardson had been at the mill since 1989. Acker Smith, manager of environmental affairs for the mill, had worked there since 1983. Both were named as defendants by the plaintiffs. Both testified as adverse witnesses and as witnesses on direct examination. Their testimony covered a number of areas as follows:
The Color Question  The mill discharged approximately nineteen million gallons of effluent, or waste water, into the Leaf River daily. The mill had received a permit from the State of Mississippi which required it to control the color differential of the river from above the mill to below the mill. The color differential referred to the ability of light to be transferred through the water. The mill had performed no chemical color treatment on the Leaf River in 1991 until October, but both Richardson and Smith denied that this was related to the cost of the treatment. Smith agreed that the mill's effluent changed the color of the Leaf River but denied that *654 there was anything unnatural about the color change.
The Sludge Question  Sludge is a solid waste product of the bleaching process. The Leaf River mill produced 75 to 100 tons of sludge per day. It was sold by the mill to the public for potting soil or to be spread on agricultural land. Warren Richardson agreed that the sludge sold by the mill had detectable levels of dioxin in it. He also agreed that a permit was required from the State before the sludge could be spread. Richardson denied that the mill was required to tell the farmers using the sludge that they should not graze cattle on that land for one year after use, saying that information was voluntarily disseminated by the mill. Acker Smith testified that the dioxin levels in the sludge were below that found to be a problem by the EPA, and there was no need to warn the farmers who purchased this material.
Reduction of Chlorine Use  The paper mills' practice of bleaching their pulp product with chlorine caused dioxin to be generated as a by-product. Warren Richardson and Acker Smith both maintained that the Leaf River mill had made a concerted effort beginning in 1987 to reduce the mill's use of chlorine as the bleaching agent and to substitute in its place chlorine dioxide. Both testified that the mill had used no chlorine since July 1990. Due to this and other steps, Richardson stated that the mill had achieved non-detectable dioxin levels in its effluent since the summer of 1990. Richardson agreed that one of the advantages of using chlorine as a bleaching agent was its lower cost, and that the use of chlorine dioxide in the bleaching process was not new to the paper industry.
Donations to Mississippi Department of Environmental Quality  Warren Richardson had in 1990 sent a check for $150,000.00 to the DEQ, along with an article taken from Business Quarterly, Fall 1990. The article dealt with allocation of resources, and Richardson had highlighted several portions dealing with expending large amounts of resources to save relatively few people. The donation was to be used to fund continuing fish studies, and Georgia-Pacific had entered into an agreement with DEQ to continue yearly contributions for this purpose.
Office Memoranda  Plaintiffs Exhibit 286 was a Great Northern Paper inter-office memorandum from V.V. Lapinoja, director of research, to D.K. Phenicie, manager of environmental affairs, dated October 7, 1985. Exhibit 286 dealt with detection of dioxin in the sludge of certain paper mills in Maine. Warren Richardson testified that the memorandum gave him little concern because it did not involve the plant in which he was working at the time. Acker Smith denied that Exhibit 286 should have alerted him and others at the mill that dioxin could be going into the Leaf River via the effluent. Smith also denied that dioxin could have been detected in the effluent if the mill had tested for it at that time, considering the low amounts present and the technology existing at that time. Smith added that the dioxin levels at Leaf River were so much lower than those found in the Maine paper mills that he felt that there was no problem.
Plaintiffs' Exhibit 287 was a telefax dated September 30, 1987, from Peter Schmutzler, one of Leaf River's European agents, to R.C. Miller of the Leaf River mill, asking for certification on behalf of the Melitta Company that the pulp produced by the mill did not contain any dioxin. Melitta produced coffee filters with the pulp purchased from the mill. Someone had written across the bottom of the telefax, "not to be answered." Warren Richardson stated that the person to whom the telefax had been sent was not qualified to answer it. He added that the mill had subsequently developed a sampling program with Melitta.
Plaintiffs' Exhibit 289 was a Leaf River office memorandum dated October 14, 1988, from R.A. Venditti to D.R. Hubbard, entitled "Possible Effects of the Dioxin Issue at Leaf River Forest Products, Inc." A large portion of the memorandum dealt with costs for dealing with dioxin, and none of the memorandum dealt with possible health risks for those who might be exposed.
Plaintiffs' Exhibit 290 was a Leaf River office memorandum dated November 11, 1988, from D.R. Hubbard to various mill *655 personnel concerning sampling at the mill by the National Council on Air and Stream Improvement ("NCASI"), the scientific or technical branch of the American Paper Institute, as part of a twenty-five mill dioxin study. The memorandum summarized various operations procedures and suggested changes for these procedures during the actual sampling period. Warren Richardson testified that NCASI and EPA were aware of the steps being taken before the test sampling was done, and that these steps were being taken according to NCASI and EPA guidelines.
Plaintiffs' Exhibit 292 was a Leaf River office memorandum dated January 27, 1989, referring to an EPA study on dioxin levels of fish caught in the area. The memorandum stated that as to the testing protocol, Great Northern Nekoosa "has been denied confidentiality." Warren Richardson stated that he had not written the memorandum and was not yet working at the Leaf River mill when it was written. He agreed that he had received a copy of the memorandum but denied that it had any special meaning for him at the time. Richardson denied that the memorandum referred to an effort on the part of the mill to cover up the information about dioxin being found in the fish. He stated instead that Exhibit 292 referred to industrial confidentiality, or certain trade secrets the mill did not want to reveal to competitors despite its participation in the EPA study.
Press Releases  Warren Richardson denied that the defendants had put out inaccurate, misleading press releases. He agreed that the press release of July 20, 1990, which mentioned the improved levels of dioxin in nine catfish caught in the Leaf River did not mention the actual dioxin levels of two other catfish, though the release did state that the catfish had "elevated levels." Richardson stated that the levels not reported were from a kind of catfish that had not been caught before, so there was nothing to compare them to. He added that the two fish did not represent a satisfactory sample of what people would catch or consume in that area.
Warren Richardson also drank a sample of water drawn from the holding pond at the Leaf River mill. The sample was presented to the jury so that they could smell it. Richardson denied that it had any smell.

APPELLANTS' EXPERTS
Lee M. Thomas had served as the Environmental Protection Agency's assistant administrator in charge of waste programs, such as the Superfund, from 1983-1985, and had served as administrator of the EPA from 1985 until 1989. Thomas was offered as an expert "on the topic of government regulation generally and specifically in EPA's regulation of dioxin." Thomas discussed the EPA's and the paper industry's efforts in conducting the five mill dioxin study in 1986 and the 25 and 104 mill studies in 1988 and 1989.[1] Thomas agreed that the paper industry had paid for the 104 mill study, and he also agreed that he had never recommended shutting down paper mills when it was discovered that they were sources of dioxin. Thomas denied that the Leaf River was the most polluted, in terms of dioxin, in the country, and denied that the paper industry had ever approached him about weakening dioxin regulations. He further denied that there was data showing dioxin to be a human carcinogen.
Dr. Kenneth Dickson served as a professor of aquatic ecology at the University of North Texas in Denton, Texas. He was accepted as an expert in the fields of aquatic ecology and aquatic biology. Dickson testified that he had examined several studies done concerning the Leaf and Pascagoula Rivers and offered the following conclusions: (1) the Leaf and Pascagoula Rivers were in good condition; (2) the rivers had made a remarkable recovery from pollution problems of the *656 1950's-60's; (3) there was "no impact on the ecological health of the aquatic communities downstream of the mill, compared to upstream of the mill." He stated that it was extremely unlikely that the mill's effluent could have any effect on aquatic life 100 to 125 miles below the mill. He also labeled as unlikely the effluent from the mill causing a color change in the river 100 miles down river.
James Davis, Jr. was called as an expert real estate appraiser. Davis denied that the Ferguson property had decreased in value due to alleged dioxin contamination or to the 1990 fishing advisory, saying that this had not been born out by comparable sales in the area.
Dr. Wood Hiatt, professor of psychiatry at the University of Mississippi, had reviewed Dr. Stanley's file and the tests that Dr. Stanley had administered to the Fergusons. Dr. Hiatt found it unacceptable that the Fergusons had been seen together by Dr. Stanley instead of being evaluated as individuals. Dr. Hiatt found that the Fergusons' fear of cancer was not reasonable, as they had refused to have themselves tested to determine if they had potentially dangerous levels of dioxin in their bodies.
Dr. John Doull, professor of toxicology and pharmacy at the University of Kansas, specialized in pesticides, which included work with dioxin. Dr. Doull agreed that dioxin had caused cancer in some animals at high doses but had decreased breast cancer in other animals at low doses. Doull stated that the United States had been much more conservative in setting dioxin standards than the other industrialized nations. He testified that the Fergusons, considering the distance they lived downriver from the mill, should have no basis for concern for their health. Doull labeled the State of Mississippi's standard on dioxin as very conservative and denied that the Fergusons had any increased risk of developing cancer.
Dr. Renate Kimbrough, a physician who had worked for several governmental agencies, including the Center for Disease Control, the Food and Drug Administration, and the Environmental Protection Agency, was accepted as an expert in public health and epidemiology. She was familiar with the ten to fifteen major studies done on dioxin exposure. Kimbrough testified that there had been no convincing study showing an excess of cancer in those exposed to many times the levels of dioxin alleged to be present in the Leaf and Pascagoula Rivers. She further stated that it would be important to test the blood of the plaintiffs to see whether they had been exposed at all, and to see whether their levels were any different than a normal person's. Dr. Kimbrough had suggested the blood testing protocol offered by the defendants and rejected by the plaintiffs. Kimbrough testified that, assuming dioxin levels of four parts per trillion in fish around the Leaf River mill, and assuming that the plaintiffs lived one hundred miles downriver, she would not expect the plaintiffs to have anything other than normal background exposure. She denied that eating fish from the Leaf or Pascagoula River would pose any health risk. Kimbrough agreed that people who ate large amounts of fish regularly would get higher exposure rates, but not necessarily increased risk.

OTHER WITNESSES
Noel Hillman, wildlife supervisor for the Mississippi Department of Wildlife, Fisheries and Parks in Hancock, Harrison, Jackson, Greene, Stone and George Counties, had lived in Greene County all of his life and was familiar with the Leaf/Pascagoula River systems. He testified for the Fergusons that there had been a color change in the water and sandbars of the river system since the Leaf River mill had been built. He also noticed a different smell from the river during the same time, though this had been south of the Ferguson property in the vicinity of the International Paper mill. Hillman stated that before the Leaf River mill was built one could see down into the Leaf River at dead low water, but this was no longer true. The color change was less marked the further down the Pascagoula one went. Hillman had not seen any change in the number, health or kinds of fish in the Leaf River. He had seen numerous fish with sores in several rivers besides the Leaf, particularly in the summer months.
*657 John Lambeth, outdoors editor for the Sun Herald newspaper, testified for the defendants that he had fished the Leaf, Pascagoula and Chickasawhay Rivers, as well as their tributaries, for 30 years. He had noticed the color and clarity of the Leaf and Pascagoula Rivers before and after the mill had opened, and could see no significant difference in the colors. According to Lambeth, the fish he had caught in these rivers were in better health than before the mill opened. Lambeth stated that he would eat catfish from the rivers, but that he had also abided by consumption limits posted by the State and had not fished during the ban.
Charles Chisolm served as director of the Office of Pollution Control for the Mississippi Department of Environmental Quality. He directed the Office's activities, including permitting, enforcement and oversight, and testified as a witness for the defendants. Chisolm agreed that the DEQ had been involved in dioxin studies in 1985 and 1988, and agreed that some of the studies had been funded by the paper mills. He acknowledged that the Leaf River mill had agreed to pay $150,000.00 in 1990 and $195,000.00 in 1991 to the DEQ, and that these payments were public knowledge. Chisolm agreed that the DEQ had issued one fish consumption advisory on the Pascagoula River in the latter part of 1990 for a period of two to three months. He said that the advisory was issued out of an abundance of caution because of one flathead catfish with a dioxin level of 42 parts per trillion which was caught near Merrill in August 1990. The DEQ had concluded since that time that there should be no health concerns about eating fish from the Pascagoula River. Chisolm testified that the Leaf River mill had a good compliance record with its discharge permit, that the mill's permit allowed a dioxin discharge limit of 40 parts per quadrillion, while the EPA standard would allow 160 parts per quadrillion. He further testified that the mill was complying with the schedule in its permit concerning color. The DEQ had investigated the reports of fish with sores, and had not found anything abnormal showing the mill to be the cause. Chisolm denied that the fishing ban was lifted because of pressure from the Governor's office, and in turn from Georgia-Pacific. He agreed that the DEQ had never fined the mill for discharge violations. Chisolm denied that the DEQ knew before the mill was built that the result would be pollution problems for the Leaf and Pascagoula Rivers.
After the defendants rested, plaintiffs called Admiral Elmo Zumwalt, Jr., retired, as a rebuttal witness. Motions for peremptory instructions were granted as to Acker Smith and Warren Richardson.
The jury found in favor of the defendants on the trespass count. As to nuisance, the jury found for the Fergusons, awarding $10,000.00 each. On the emotional distress count the jury found for the Fergusons, awarding $90,000.00 each. In addition, the jury awarded $3,000,000.00 in punitive damages to the Fergusons. The jury found against Louise H. Mitchell on all counts. Final judgment to this effect was entered on February 19, 1992.
Defendants filed a Motion for a Judgment N.O.V. or in the Alternative for a New Trial on February 28, 1992. After a hearing, the trial court entered its order denying the motion. Defendants timely filed their notice of appeal, raising six issues, each of which contain numerous subparts. Because we find that the judgment in favor of the appellees must be reversed and rendered in its entirety, we address only two of the issues.

I. WHETHER THE EMOTIONAL DISTRESS VERDICT BELOW MUST BE REVERSED, BECAUSE (A) THERE WAS NO EVIDENCE THAT PLAINTIFFS HAD BEEN EXPOSED TO ANY HARMFUL SUBSTANCE RELEASED BY DEFENDANTS; (B) PLAINTIFFS' CLAIM FOR FEAR OF FUTURE DISEASE IS NOT COMPENSABLE UNDER MISSISSIPPI LAW ABSENT A SHOWING OF LIKELIHOOD OF DISEASE OR ACTUAL ILLNESS; (C) THE JURY INSTRUCTIONS ON EMOTIONAL DISTRESS WERE IRRECONCILABLY CONFUSING AND CONFLICTING; (D) PLAINTIFFS' EVIDENCE OF WILLFUL MISCONDUCT WAS INSUFFICIENT AS A MATTER OF LAW.
Appellants argue both that the Fergusons failed to show that they were exposed to *658 dioxin and that the cause of action for fear of future disease does not exist or is not compensable. Assuming there is such a cause of action, appellants argue that there is insufficient evidence to show that appellees' fear is reasonable.
This state recognizes recovery for both negligently and intentionally inflicted emotional distress:
Where there is something about the defendant's conduct which evokes outrage or revulsion, done intentionally  or even unintentionally yet the results being reasonably foreseeable  Courts can in certain circumstances comfortably assess damages for mental and emotional stress, even though there has been no physical injury. In such instances, it is the nature of the act itself  as opposed to the seriousness of the consequences  which gives impetus to legal redress. Thus, our holdings in the above enumerated cases.
Also, in a case of simple, or ordinary "garden variety negligence," even in the absence of physical injury accompanying the negligent conduct, if there is a resulting physical illness or assault upon the mind, personality or nervous system of the plaintiff which is medically cognizable and which requires or necessitates treatment by the medical profession, this Court has followed the modern tendency and held a legal cause of action exists. This assumes, of course, the test of reasonable foreseeability is also satisfactorily met.
Sears, Roebuck & Co. v. Devers, 405 So.2d 898, 900 (Miss. 1981); see also Jenkins v. City of Grenada, 813 F. Supp. 443 (N.D.Miss. 1993) (citing Devers).
It would be impossible to enumerate all the ways in which emotional distress could be inflicted. However, this Court has never allowed or affirmed a claim of emotional distress based on a fear of contracting a disease or illness in the future, however reasonable.
In this case, there is a lack of evidence proving exposure of the appellees to a dangerous or harmful agent and the record is devoid of any medical evidence pointing to possible or probable future illness. Certainly, if one is to recover for emotional distress predicated on potential future illness there must be substantial proof of exposure and medical evidence that would indicate possible future illness.
The appellees fail in their proof on both counts; therefore, this is not a case to allow recovery for emotional distress based on a fear of occurrences in the future. The Fergusons will be able to pursue a cause of action against the appellants if any disease caused by alleged exposure to dioxin manifests itself in the future. Owens-Illinois, Inc. v. Edwards, 573 So.2d 704 (Miss. 1990). Their claim based on fear of future disease is at best, premature.
Appellants further argue that the emotional distress claim cannot be based on intentional, willful, wanton or grossly negligent conduct, as the record is devoid of proof in this area. They cite Sears v. Devers and Wirtz v. Switzer, 586 So.2d 775 (Miss. 1991), as providing the proper standard. Appellants further rely on Jett Drilling Co. v. Jones, 251 Miss. 332, 169 So.2d 463 (1964), which involved an oil drilling operation on one property which caused drainage and waste water to be deposited on the adjacent property. The adjacent property owners sued, and damages were awarded, though it is not clear whether punitive damages were allowed. On appeal, this Court found that a punitive damages instruction would be improper, as the manager of the drilling operation was informed about the problem and altered the operation in an attempt to solve it (albeit unsuccessfully). Jett Drilling, 251 Miss. at 339, 169 So.2d at 465.
Appellants also cite Laurel Equipment Co. v. Matthews, 218 Miss. 718, 67 So.2d 258 (1953), which involved a nuisance caused by a paint shop. The adjacent property owners received actual and punitive damages. This Court found that there was proof that "the painting was done in accordance with approved methods, and that on the only occasion when a complaint was made to the responsible head of the business, he endeavored diligently to correct the trouble," and as a result the punitive damages award was reversed. Laurel Equipment, 218 Miss. at 722-23, 67 So.2d at 260.
*659 This Court has on a number of occasions considered the tort of intentional infliction of emotional distress. See Fuselier, Ott & McKee, P.A. v. Moeller, 507 So.2d 63 (Miss. 1987) (firing of attorney, including changing of door locks to office, not sufficient conduct); T.G. Blackwell Chevrolet Co. v. Eshee, 261 So.2d 481 (Miss. 1972) (forging of car buyer's name on finance contract, sufficient conduct); Lyons v. Zale Jewelry Co., 246 Miss. 139, 150 So.2d 154 (1963) (abusive bill collection tactics amounted to sufficient conduct). As stated in Sears v. Devers and reiterated in these cases, the standard is whether the defendant's behavior is malicious, intentional, willful, wanton, grossly careless, indifferent or reckless. Appellants question the sufficiency of the evidence supporting the verdict in favor of the appellees. The applicable standard of review may be found in Munford, Inc. v. Fleming, 597 So.2d 1282, 1284 (Miss. 1992), which states that this Court should
consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, [we are] required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required.
Dioxin was discovered in sludge in paper mills in Maine in 1985. There is a reasonable inference that it was in the sludge of the Leaf River mill at that time as well. There was no testing of the mill's effluent until late 1988 or early 1989. The appellants state that it was present in such low levels that it could not have been found anyway with the technology available. Once the effluent was tested, dioxin was found. In 1989, when Warren Richardson came to the mill, dioxin was on the "front burner." The Pascagoula was closed to commercial fishing from October 1990 to January 1991. The jury heard evidence concerning appellants' public relations efforts; their efforts to find out the nature and extent of the dioxin problem; their concerns of economics versus safety; and their relationship with the state's regulatory agencies. With all favorable inferences going to the benefit of the appellees, the Court finds that the jury finding of intentional infliction of emotional distress based on the conduct of the appellants should be reversed and rendered.
Appellants further claim that this award is based in part on Fergusons' allegations that appellants failed to warn the public, or the Fergusons specifically, about the nature and danger of dioxin once they discovered it was being discharged into the river. There was evidence presented to this effect, though the jury was not specifically instructed on failure to warn. Appellants argue that their duty was to promptly inform the Office of Pollution Control of the Department of Environmental Quality. Miss. Code Ann. § 49-17-17 (Supp. 1990) provides that the Mississippi Commission on Environmental Quality, acting through the Office of Pollution Control, "shall have and may exercise the following powers and duties: ... (g) To collect and disseminate information relating to air and water quality and pollution and the prevention, control, supervision and abatement thereof; ..." There is no evidence in this record that appellants did not timely report to the DEQ the critical information concerning the scope of the dioxin problem. We find that, under the circumstances of this case, this was all the appellants were required to do.
In sum, the Court may someday recognize the tort of infliction of emotional distress based on fear of future disease. However, this day we find that the evidence is insufficient in this case to hold that the appellants may be liable for infliction of emotional distress based on intentional, willful, wanton or grossly negligent conduct. The common thread running through this issue is a lack of proof. The Fergusons failed to have their persons or their property tested for dioxin. They place before the jury evidence of the danger of dioxin, but then fail to show that dioxin is present on their land or in their body. They produce evidence of dioxin in *660 the area immediately south of the Mill and no evidence of dioxin in waters in the immediate area of their property. They have shown no physical or personal injury. Their claims are too remote as to real illness and as to proximity to the alleged source of their fears. They are afraid of what may happen in the future but have refused to take available steps that could alleviate or justify those fears. Appellants' conduct in the operation of the Leaf River Mill and their attempts to deal with the dioxin problem simply do not meet the necessary standard of intentional, willful, wanton, or grossly negligent. The circuit court's judgment based on emotional distress is reversed and rendered.

II. WHETHER THE NUISANCE VERDICT BELOW MUST BE REVERSED, BECAUSE (A) THERE WAS NO EVIDENCE OF ANY HARMFUL SUBSTANCES ON OR NEAR PLAINTIFFS' PROPERTIES; (B) PLAINTIFFS' EVIDENCE OF INJURY WAS BASED ON MERE "STIGMA," WHICH IS NOT COMPENSABLE UNDER MISSISSIPPI LAW; AND (C) EVIDENCE OF THE HEALTHY CONDITION OF THE RIVER NEAR PLAINTIFFS' PROPERTIES WAS IMPROPERLY EXCLUDED.
The appellees alleged, in their second amended complaint, that the appellants had discharged "into the waters of the Leaf River, and the East and West Pascagoula Rivers dark and foul smelling effluent in sufficient quantities that the color of the river is often altered as far downstream as waters adjacent to plaintiffs' property in Jackson County, Mississippi." The appellees further alleged that the appellants had created a public nuisance, a private nuisance, and a nuisance per se. The nuisance per se claim was eventually dropped by the appellees.
O.V. Stringer first noticed a change of color in the water and in the sandbars of the Pascagoula in 1990, calling it a dark tea or copper color. He stated that the darkening had affected his ability to maneuver his boats in the water. Kenneth McGuire stated that the Pascagoula turned an orange color in 1985 or 1986, and since the river had become darker it had developed a fibrous consistency. Thomas Ferguson testified both about the public stigma concerning dioxin on his land, and his observation of the river getting darker since 1986-87. Bonnie Ferguson first noticed that the river was darkening in 1985, to a "light coffee" color. Guy Blankinship, the appellees' appraiser, testified at length about the "stigma," or the "specter of the stigma," or the "pollution of the water" with respect to the Mitchell and Ferguson properties. Noel Hillman stated that the Leaf River's darkening color had some effect on the Pascagoula's color.
The jury found in favor of the Fergusons on their nuisance claim but in favor of the appellants on the claim for trespass. Whether this finding was under the theory of public or private nuisance is unknown, as the circuit court erroneously refused to require the appellees to specify which type(s) of nuisance they were alleging. Jury instruction D-7 dealt with public nuisance. Instructions P-10 and P-11 appear to contain some elements of private nuisance.
As a preliminary matter, appellants allege that the Fergusons' action is time-barred under Miss. Code Ann. § 95-3-29, which provides:
(1) In any nuisance action, public or private, against an agricultural operation, proof that said agricultural operation has existed for one (1) year or more is an absolute defense to such action, if the conditions or circumstances alleged to constitute a nuisance have existed substantially unchanged since the established date of operation.
(2) The following words and phrases as used in this section shall have the meanings given them in this section:
(a) "Agricultural operation" includes, without limitation, any facility for the production and processing of crops, livestock, farm-raised fish and fish products, livestock products, and poultry or poultry products for commercial or industrial purposes.
(b) "Established date of operation" means the date on which the agricultural operation commenced operation. If the physical *661 facilities of the agricultural operation are subsequently expanded, the established date of operation for each expansion is deemed to be a separate and independent "established date of operation" established as of the date of commencement of the expanded operation and the commencement of expanded operation shall not divest the agricultural operation of a previously established date of operation.
(3) The provisions of this section shall not be construed to affect any provision of the "Mississippi Air and Water Pollution Control Law."
(4) This section shall not affect actions commenced prior to July 1, 1980.
Miss. Code Ann. § 95-3-29 (Supp. 1993).
In Bowen v. Flaherty, 601 So.2d 860 (Miss. 1992), Flaherty, a chronic asthmatic, purchased land in Pontotoc County in 1978. In 1980, the Bowens built and began to operate a cotton gin 300-400 feet from Flaherty's property. Flaherty filed suit in 1986, alleging that the gin constituted a private nuisance. The chancery court rejected the Bowens' statute of limitations defense based on § 95-3-29. This Court reversed and rendered, finding that the cotton gin was an agricultural operation within the meaning of § 95-3-29(2)(a). This Court further found that all of the functions listed under (2)(a) did not have to be included before the definition of "agricultural operation" was met. Bowen, 601 So.2d at 862-63.
Section 95-3-29 is a type of statute sometimes referred to as a "right to farm" statute. One of its purposes is to prevent homes or businesses from building in the vicinity of an established agricultural operation and then attempting to have the agricultural operation penalized as a nuisance because of odors, sounds and sights traditionally associated with such a business. See generally Margaret Rosso Grossman & Thomas G. Fischer, Protecting the Right to Farm: Statutory Limits on Nuisance Actions Against the Farmer, 1983 Wis.L.Rev. 95 (1983). Appellants argue that the mill is an "agricultural operation" which produces and processes a crop, timber. Appellants presented testimony concerning the mill's growing its own trees for use in the mill, as well as the process of turning wood into pulp. Appellants cite numerous authorities for the proposition that timber is a crop under the statute, including Tally v. Carter, 318 So.2d 835, 839 (Miss. 1975) (prices for 25- and 35-year old timber "crop" provided); Miss. Code Ann. § 49-19-3(3) (... encourage ... "production of a wood crop"); Miss. Code Ann. § 73-34-3(l) ("Timberland" ... capable of producing, "timber as a crop"). We find that under the circumstances of this case, timber is a crop for the purposes of § 95-3-29.[2]
Several of the right to farm statutes adopted by other jurisdictions include language to the effect that limitations on nuisance actions do not prohibit actions involving pollution of streams or other bodies of water which may cross the plaintiff's property. See Ala. Code § 6-5-127(b) (1993); Ark. Code Ann. § 2-4-106 (Michie 1987); Mo. Ann. Stat. § 537.295(3) (Vernon Supp. 1993); Va. Code Ann. § 3.1-22.29(C) (Michie 1983). The corresponding section of § 95-3-29 is (3), which provides that provisions of the Mississippi Air and Water Pollution Control Law, §§ 49-17-1 through 49-17-43, apply in spite of § 95-3-29. Section 49-17-5(1)(a) defines water pollution as:
... such contamination, or other alteration of the physical, chemical or biological properties, of any waters of the state, including change in temperature, taste, color, turbidity, or odor of the waters, or such discharge of any liquid, gaseous, solid, radioactive, or other substance or leak into any waters of the state unless in compliance with a valid permit issued therefor by the permit board.
Section 49-17-29(2)(a) provides that:
[i]t shall be unlawful for any person (i) to cause pollution of any waters of the state or to place or cause to be placed any wastes in a location where they are likely to cause pollution of any waters of the state; (ii) to discharge any wastes into any *662 waters of the state which reduce the quality of such waters below the water quality standards established therefor by the commission; or (iii) to violate any applicable pretreatment standards or limitations, technology-based effluent limitations, toxic standards or any other limitations established by the commission. Any such action is hereby declared to be a public nuisance.
Section 49-17-43 allows the Commission to fine violators of the act.
There was a great deal of testimony concerning appellants' compliance with its permits and with state standards. The allegations made by the appellees in their complaint are very similar to the actions defined as violations of the Air and Water Pollution Act. Given the purpose of § 95-3-29, it should not be allowed to defeat a nuisance action on property one hundred miles downstream from the mill. In Herrin v. Opatut, 248 Ga. 140, 142, 281 S.E.2d 575, 578 (1981), the Georgia Supreme Court, in construing its "right to farm" statute, stated "that which may constitute a nuisance regardless of urban sprawl, such as polluting a stream, is never protected by the statute since such activity does not become a nuisance as a result of `changed conditions in the surrounding locality.'" Appellees' nuisance cause of action is not time-barred.
"A private nuisance is a nontrespassory invasion of another's interest in the use and enjoyment of his property. One landowner may not use his land so as to unreasonably annoy, inconvenience, or harm others." Bowen v. Flaherty, 601 So.2d 860, 862 (Miss. 1992). The elements of private nuisance are outlined in Comet Delta, Inc. v. Pate Stevedore Co. of Pascagoula, Inc., 521 So.2d 857 (Miss. 1988):
One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either
(a) intentional and unreasonable, or
(b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities. Comet Delta, 521 So.2d at 859-60 (quoting Restatement (Second) of Torts § 822). An actual physical invasion of the property in question is not required for recovery for nuisance. Aesthetic considerations, including color changes, are relevant in consideration of whether a private nuisance exists. See Cooper Tire & Rubber Co. v. Johnston, 234 Miss. 432, 106 So.2d 889 (1958) (emission of carbon black settled on plaintiff's property, resulting in nuisance); Laurel Equipment Co. v. Matthews, 218 Miss. 718, 67 So.2d 258 (1953) (emission of paint fumes involved color and smell); Cook Industries, Inc. v. Carlson, 334 F. Supp. 809 (N.D.Miss. 1971) (offensive odors and pools of discolored water and greasy film left on ditch banks constituted private nuisance).
Appellants argue that the nuisance verdict cannot stand because (a) appellants failed to prove dioxin from the mill was actually on or near their property and (b) damage from stigma, or public perception alone, is not recoverable. Appellants rely first on Shutes v. Platte Chemical Co., 564 So.2d 1382 (Miss. 1990). The Shutes alleged that Platte Chemical, immediately adjacent to the Shutes' property, had committed trespass and had caused a nuisance. The Shutes reported dying vegetation, and also stated that they could smell the plant, and that it made their eyes water and their noses run. The Shutes proved that linuron, a herbicide, was actually present in their soil. The only plant in the area producing linuron was that belonging to Platte. The trial court granted a directed verdict in favor of Platte. This Court reversed, finding that the Shutes had presented sufficient evidence to establish a jury question. Shutes, 564 So.2d at 1384. The differences between the proof offered in Shutes and in this case are manifest. The Shutes proved that the only entity in the vicinity of their property producing linuron was Platte Chemical, and that linuron was actually on their property. The Shutes testified as to the actual physical effect Platte Chemical had on their health and on their property. The Fergusons produced no proof of this type.
Appellants also cite Berry v. Armstrong Rubber Co., 989 F.2d 822 (5th Cir.1993), *663 which involved a suit by several Natchez residents against Armstrong, which had operated a tire manufacturing plant in Natchez from 1937 to 1987. "It is undisputed that from 1937 through the 1970s, Armstrong `dumped' waste materials from this plant into various sites around the Natchez area. It is also undisputed that several of these sites are located near the areas in which plaintiffs live. Plaintiffs claim that this dumping left hazardous chemicals on their land and in their groundwater." Berry, 989 F.2d at 824. Plaintiffs sued on several theories, including nuisance. The district court dismissed the claims on summary judgment, finding that the plaintiffs had never had their soil tested, and had not shown that toxic chemicals were actually on the property. Their expert on property damage testified only that the stigma, or public perception of the presence of hazardous chemicals, had damaged the plaintiffs' property values. The Fifth Circuit affirmed, saying:
Plaintiffs point to Phillips v. Davis Timber Co., Inc, 468 So.2d 72 (Miss. 1985), to support their common law nuisance and trespass claims. In that case, the Mississippi Supreme Court held that a plaintiff could state a claim for nuisance even if the levels of toxins found on the land did not reach dangerous levels. However, a plaintiff must present evidence of an invasion by defendant in order to withstand summary judgment. Phillips, 468 So.2d 72, 79. The Cooper and Berry plaintiffs failed to show such evidence of an "invasion" by Armstrong to withstand summary judgment.
A cause of action for public nuisance is predicated on a showing that the defendant's activities have injured a public right. See Comet Delta, Inc. v. Pate Stevedore Co. of Pascagoula, Inc., 521 So.2d 857, 860 (Miss. 1988). The summary judgment record of testing by many agencies and organizations showed no threat to human health. Plaintiffs presented no evidence of test results showing a level of pollutants on plaintiffs' property that could endanger the public. The summary judgment dismissing the nuisance claim is affirmed.

.....
Plaintiffs' expert appraiser, William Upchurch, contended that the stigma attached to plaintiffs' property had significantly reduced its value. The district court concluded that even if this expert testimony was accepted as true, plaintiffs could not recover under Mississippi law for reduced market caused by a "stigma" absent some physical damage to plaintiffs' land caused by the defendant.
Plaintiffs point to two Mississippi cases to support the claim that a decrease in market value caused by a "stigma" is compensable. See Phillips v. Davis Timber Co., Inc., 468 So.2d 72, 78 (Miss. 1985); Bynum v. Mandrel Industries, Inc., 241 So.2d 629, 633 (Miss. 1970). In both these cases, the defendant physically damaged the plaintiff's property. Plaintiffs have cited no case, and the court has found none, holding that Mississippi common law allows recovery for a decrease in property value caused by a public perception without accompanying physical harm to the property.
Berry, 989 F.2d at 829; see also Adkins v. Thomas Solvent Co., 440 Mich. 293, 487 N.W.2d 715 (1992) (nuisance cause of action dismissed where damage and injury predicated on unfounded public fear or perception). As in Berry, the Fergusons presented no evidence of tests done on their property to show the possible levels of dioxin or any other pollutant.
Appellants also rely on Masonite Corporation v. Dennis, 175 Miss. 855, 168 So. 613 (1936). Dennis owned property on the Leaf River, approximately 40-50 miles downstream from a Masonite plant, which manufactured some kind of board or wood product. Dennis alleged that the wood fiber discharged into the river by Masonite had caused fish kills, offensive odors, and resulted in a harmful sediment being deposited on his property. The jury found for Dennis. This Court reversed and rendered, saying that Dennis had failed to prove causation. Dennis, 175 Miss. at 868, 168 So. at 616.
The Fergusons argue that their nuisance claim was based not only on "the dioxin problem, but is also based on the unsightly discoloration of the water, river banks, and *664 sand bars caused by Defendants' injection of the darkening effluent into the Leaf River." They cite Southland Co. v. Aaron, 221 Miss. 59, 72 So.2d 161 (1954). Southland opened an oil refinery in 1946 approximately five-eighths of a mile from Aaron's land. Southland allowed its effluent to be emptied into a small tributary which eventually emptied into the Boguehoma Creek, which passed through Aaron's land. There had also been an oil spill of around 400 barrels in 1951, and there was evidence that the Boguehoma had a large amount of salt in it. After a verdict in favor of Aaron, this Court found that the issue of liability should be affirmed. In doing so the Court provided that the "riparian proprietor" had a right to use the water in question "in its natural purity, or in the condition in which he has been in the habit of using it," and that:
a riparian owner sustaining substantial injuries by reason of such an invasion of his rights may maintain an action without regard to the motive which prompts the invasion, and the pollution of a stream to the injury of a lower proprietor will not be justified by the importance of the business of the upper proprietor to either the public or the wrongdoer, or by the fact that the latter is conducting such business with care and in the only known practicable mode.
Southland, 221 Miss. at 72, 72 So.2d at 165 (quoting 56 Am.Jur. Waters § 405 (1947)).
The Fergusons also rely on Phillips v. Davis Timber Co., Inc., 468 So.2d 72 (Miss. 1985), which was cited in Berry v. Armstrong Rubber. Phillips proved that pentachlorophenol (PCP) had polluted his lake because of the operation of Davis Timber Company. The trial court found that "the levels of PCP were sub-lethal and did not result in damage to the aquatic wildlife and to human beings," and denied relief. This Court reversed, finding that, under a nuisance theory, "a plaintiff may recover damage by a physical invasion of his property on a simple showing that the defendant was responsible for the physical invasion." Phillips, 468 So.2d at 78.
There was testimony that the Pascagoula had darkened, and river banks and sand bars had also been discolored. There was no testimony from O.V. Stringer or Kenneth McGuire as to the location of their properties in relation to the Ferguson property, or where they had seen the discoloration in the Pascagoula. There was no testimony that the Fergusons' property had been darkened, or that the river had left a dark residue on their land or their buildings. There was no testimony showing the appellants to be the cause of this color change except that the change had been noticed after the appellants began operation of the mill. Some of the appellees' witnesses noticed the color change around 1985; others did not until 1990. Guy Blankinship never mentioned any damage to the property except for the condition of the river and the resulting stigma. We find that the evidence presented is insufficient to constitute a significant interference with the Fergusons' use and enjoyment of their property. We further find that mere stigma, supported by tests showing dioxin contamination no closer than eighty river miles north of the alleged damage, is not sufficient evidence of compensable injury.
Comet Delta, 521 So.2d at 860, also provides the elements of public nuisance:
(1) A public nuisance is an unreasonable interference with a right common to the general public.
(2) Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:
(a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or
(b) Whether the conduct is proscribed by a statute, ordinance or administrative regulation, or
(c) Whether the conduct is of a continuing nature or has produced a permanent or long lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.
(quoting Restatement (Second) of Torts, § 821B). "To recover damages [for public nuisance] the plaintiff usually must have sustained harm different in kind, rather than in *665 degree, than that suffered by the public at large." Comet Delta, 521 So.2d at 861; but see Ronald J. Rychlak,: The Role of Common-Law Remedies for Environmental Wrongs Private Nuisance, 59 Miss.L.J. 657, 659 n. 12 (1989) (public nuisance requirement of different kind of harm under attack as "relic"). If one were to assume that the darker water of the Pascagoula and stains on riverbanks and sandbars were enough to qualify as an unreasonable interference with those public rights listed in 2(a), (b) or (c), there is still the matter of a harm different from that suffered by the public at large which the Fergusons must have endured. A reduction of recreational or aesthetic use or enjoyment of the river is the same injury that the general public would suffer. Appellees argue that part of their emotional distress damages results from the diminution of value of their property and their inability to leave something of value to their son. This is a different kind of damage than that suffered by the general public which could be compensable as the result of a public nuisance. However, the verdict form showed that the jury awarded the Fergusons $10,000.00 each for nuisance damages. The jury awarded the Fergusons $90,000.00 each for emotional distress. Emotional distress may not serve as a component of the nuisance award where it was separately awarded. Because we find that the evidence is insufficient to support recovery under either public or private nuisance, we do not reach the question of whether certain evidence offered by the appellants was wrongfully excluded by the circuit court. As with their emotional distress claim, the Fergusons' nuisance claim cannot stand due to a failure of proof. The judgment of the Circuit Court of Jackson County in favor of the Fergusons and against Leaf River Forest Products, Inc., Great Northern Nekoosa Corporation and Georgia-Pacific Corporation is reversed and rendered in its entirety.
REVERSED AND RENDERED.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and SULLIVAN, BANKS, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.
McRAE, J., dissents with separate written opinion.
McRAE, Justice, dissenting:
The majority's ruling is contradictory to the long established principal of law in this state that physical impact or injury is not necessary to prove intentional, or even negligent infliction of emotional distress. First Nat'l Bank v. Langley, 314 So.2d 324, 338-339 (Miss. 1975). This case should at least be remanded for a new trial under the majority's holding since a plaintiff was not required under existing law to prove physical impact in a claim for emotional distress.
In a claim based on emotional distress, one need only show that the emotional trauma claimed was a reasonably foreseeable consequence of the negligent or intentional act of another. Langley, 314 So.2d at 339; Lyons v. Zale Jewelry Co., 246 Miss. 139, 149-50, 150 So.2d 154, 158 (1963). There is no requirement that the defendant have touched the body of the injured claimant. Langley, 314 So.2d at 339. The evidence found inadequate by the majority would merely be probative of the dioxin's physical impact on the plaintiffs in this action. The impact doctrine was abolished in Langley. A plaintiff does not have to prove physical impact to recover for intentional or negligent infliction of emotional distress.
Furthermore, a plaintiff in Mississippi "may recover damages for emotional distress due to willful or wanton acts in the absence of a simultaneous accompanying physical injury." Id. at 338. In other words, not only can a plaintiff recover damages for emotional distress without having been touched or impacted by the defendant, but he may recover damages in the absence of a physical manifestation of the injury when the conduct of the defendant involved intentional or grossly negligent acts likely to give rise to emotional distress. Id. at 336-37; Daniels v. Adkins Protective Service, 247 So.2d 710, 711 (Miss. 1971); Lyons, 246 Miss. at 149-50, 150 So.2d at 158; Arnold v. Spears, 217 Miss. 209, 217-18, 63 So.2d 850, 854 (1953); Saenger Theatres Corp. v. Herndon, 180 Miss. 791, 178 So. 86 (1938).
In concluding that the plaintiffs' fears are too remote, the majority incorrectly distinguished *666 the plaintiffs' fears from their emotional distress. The plaintiffs' emotional distress in this case is the fear that they will become sick in the future. The fear and the emotional distress are merely two different ways of describing the same injury. The fear of future illness is only a more specific way of characterizing the emotional distress suffered by the plaintiffs. The emotional distress in the present case is not "based on the fear of a future illness" as indicated by the majority. The emotional distress, or fear, is instead based on the fish kills, discoloration of the water, and foul odors among other things caused by the Leaf River pollution.
To determine the validity of an emotional distress claim, we look to the conduct of the defendant or the nature of the act to determine whether it intentionally, or with reasonable foreseeability, evokes outrage. Sears, Roebuck & Co. v. Devers, 405 So.2d 898, 900 (Miss. 1981). The fear, or emotional distress, in the case at hand was not based on abstract fear, but was instead based upon concrete physical scientific evidence that the river was knowingly contaminated by and through the conduct of Leaf River. Since it is virtually impossible to produce physical scientific evidence that will prove the existence of abstract fear, a plaintiff's evidence of emotional distress will never be persuasive if the concepts of fear and emotional distress are considered separate injuries as in the case before us. The misinterpretation of the emotional distress claims before this Court has led the majority to reinstate the impact rule in an attempt to find some physical evidence proving abstract fear. The conclusion that the fear, or the emotional distress, was too remote is merely another way of stating that the plaintiff's fear of serious illness cannot be believed. However, the jury has already decided otherwise. Through the misinterpretation of the plaintiffs' claims, the majority likewise deviates from this Court's standard of review.
This Court generally accords great deference to jury verdicts. As the majority points out, when asked to review the sufficiency of the evidence, we
consider the evidence in a light most favorable to the appellee, giving that party the benefit of all favorable inferences that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, [we are] required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required.
Munford, Inc. v. Fleming, 597 So.2d 1282, 1284 (Miss. 1992). Keeping this standard of review in mind, the majority then enumerates the bulk of those facts which do, indeed, take into account all inferences which favor the Fergusons.
The facts demonstrated that the residents who lived on the river noticed the river gradually turn darker until it became coffee-colored. They testified that they noticed large quantities of dead mussels and that the catfish became unusually scarce. With these obvious physical changes, the individuals on the river knew that something was seriously wrong with the river. In fact, the evidence showed that the chemical contamination was so concentrated during this time that the Mississippi Department of Wildlife and Fisheries closed the river to commercial fishing for six months and issued consumption advisories for fish caught in the river. Leaf River even considered the contamination serious enough to warrant the need to undertake public relations efforts to rehabilitate itself.
The intention to cause emotional distress has been defined as follows:
An intention to cause severe emotional distress exists when the act is done ... with knowledge on the part of the actor that severe emotional distress is substantially certain to be produced by his conduct. If an act is done with the requisite intention, it is immaterial that the actor is not inspired by any personal hostility to the other.
*667 Lyons, 246 Miss. at 150-51, 150 So.2d at 158. Under this definition, the evidence also supported the inference that the conduct by Leaf River which caused the contamination was intentional, or at least grossly negligent. The residents testified that they noticed the changes in the river as early as 1985. For at least five years, the quality of the river rapidly and conspicuously deteriorated as they continued to live and fish on the river. Certainly it would be a reasonable inference to conclude that Leaf River was aware of this fact. There was no doubt that Leaf River knew the practice of bleaching its pulp product caused dioxin to be produced, and it is reasonable to assume that it knew it would flow downriver if emitted from the plant.
Additional evidence of their intentional behavior showed that Leaf River received an inter-office memorandum on October 7, 1985 about the detection of dioxin in paper mills in Maine which used the same technologies as the Leaf River mill. The majority agrees that the detection of dioxin in the Maine mills was enough to create a reasonable inference that dioxin was present in the Leaf River mill in 1985. Even so, the plaintiff produced more evidence of Leaf River's awareness. On October 14, 1988, an office memorandum was sent out at Leaf River about the costs of dealing with dioxin although the memo never discussed health risks. Another office memorandum was received on November 11, 1988 explaining the steps the Leaf River mill should take before it was tested in a dioxin study of twenty-five mills.
Giving the Fergusons the benefit of any inferences to be drawn from these facts, it was certainly reasonable for the jury to conclude that Leaf River knowingly contaminated the river, or at least that the factory remained willfully blind to the fact that it was doing so despite the health risks. It was also reasonable for the jury to have concluded that this conduct was outrageous enough to cause emotional distress, or stated another way, that Leaf River knew this type of conduct was substantially certain to produce some type of emotional distress in the lives of the people who lived and fished on the river. Leaf River's knowledge of the problem without any reaction constituted intentional, or at least, grossly negligent conduct. The plaintiffs testified that they were fearful of future illness, or emotionally distressed, and they produced scientific experts who testified that their emotional distress, or fear, was reasonable. In light of the facts before this Court, the majority has hardly given any deference to the jury's findings of fact. The majority contradicts its articulated standard of review by reversing the jury verdict and rendering judgment against the river residents.
Finally, punitive damages are permitted when the misconduct is a reckless disregard for the rights of others, intentional or grossly negligent. Langley, 314 So.2d 324; Fowler Butane Gas Co. v. Varner, 244 Miss. 130, 141 So.2d 226 (1962); see Jett Drilling Co. v. Jones & Shows, 251 Miss 332, 339, 169 So.2d 463 (1964) (refusing punitive damages where evidence showed that steps were taken to alleviate problem after defendant received complaints).
The majority reverses the nuisance claim for lack of sufficient evidence demonstrating that the contamination existed as far downstream as the Ferguson property. Again, the majority fails to afford the Fergusons the benefit of all favorable inferences that may be reasonably drawn from the evidence. Noel Hillman, the wildlife supervisor, stated that the changes in color began after the Leaf River mill was built. Both Bonnie and Thomas Ferguson testified that the water changed color at the location of their property. Hillman even noticed these changes in locations that were south of and downstream from the Ferguson property. The wildlife consumption advisories and commercial fishing ban directly impacted the Ferguson property, and signs were posted to that effect both north and south of the property.
It was reasonable for the jury to conclude from this evidence that dioxin was present in the area of the Ferguson property despite the absence of scientific data specifically from the site of their property. Giving the plaintiffs the benefit of all favorable inferences to be drawn, as is required where the jury has returned a verdict for the plaintiffs, we must conclude that the evidence sufficiently established all of the elements of private nuisance. See Comet Delta Inc. v. Pate *668 Stevedore Co., 521 So.2d 857, 859-60 (Miss. 1988).
Looking, as we must, at the evidence and all reasonable inferences that may be drawn therefrom, in a light most favorable to the Fergusons, a fair-minded jury could have found that Leaf River interfered with the Fergusons' private use and enjoyment of their property, and that it was reasonable that persons living downstream from the Leaf River mill could suffer some degree of emotional distress as a result of the mill's discharge of dioxin-tainted effluence into the river, the changes in the water and fish, and the adverse publicity surrounding these events. Alternatively, if we are going to reinstate the impact rule for claims of emotional distress, this Court should reverse and remand the case for a new trial in order that the plaintiffs may be permitted to attempt to prove their case under our new law. Accordingly, I dissent.
NOTES
[1] The five mill study was a joint study conducted by the EPA and the American Paper Institute. It included five paper mills and its results, released in 1987, showed that dioxin was linked to the bleaching process used in paper mills. The results of the five mill study led to another joint EPA-API study of 104 paper mills in the United States. The results of the second study, released in 1990, showed that the production of dioxin was linked to the use of chlorine as a bleaching agent. The 25 mill study was a more specific study undertaken by the paper industry in 1988 to determine where dioxin was being formed in the pulp making process and how the formation could be avoided. The Leaf River Mill was a participant in both the latter studies.
[2] We note that in 1994, Miss. Code Ann. § 95-3-29 was amended such that the definition of "agricultural operation" now includes a "facility for the production and processing of ... wood, timber or forest products, ..."