GRIFFIS, J.,
dissenting:
¶ 16. Having considered Dan and Ann Wellses’ failure to file a brief and after a thorough examination of the record, I cannot conclude that there is a “sound and unmistakable basis or ground upon which the judgment may be safely affirmed.” May v. May, 297 So.2d 912, 913 (Miss.1974). Therefore, I respectfully dissent.
¶ 17. The chancellor determined that the Green Acres Trust built a spite fence and ordered that it be removed because it served no benefit except to annoy the Wellses. The majority concludes that there is no Mississippi authority concerning spite fences. Yet, the majority affirms the chancellor’s judgment and adopts the chancellor’s definition for spite fences from 9 Powell on Real Property, § 62.05 (Wolf ed.2000), which states:
[A spite fence is] a structure of no beneficial use to the erecting owner or occupant of the premises, but erected or maintained by him solely for the purpose of annoying the owner or occupier of the adjoining property. When the fence serves a useful purpose, there is general agreement that the motive for erecting a fence or similar structure is immaterial, even where injury is caused to a neighbor by cutting off his light and air and obstructing his view.
¶ 18. I cannot join the majority’s decision to affirm the chancellor’s judgment, which grants relief for a claim or cause of action that has no authority or precedent under Mississippi jurisprudence. The appropriate claim or cause of action is whether the fence was a private nuisance. In Leaf River Forest Products, Inc. v. Ferguson, 662 So.2d 648, 662 (Miss.1995), the court held:
A private nuisance is a nontrespassory invasion of another’s interest in the use and enjoyment of his property.... One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another’s interest in the private use and enjoyment of land, and the invasion is either (a) intentional and unreasonable, or (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.
¶ 19. The distinction between these is relatively minor. Under the Powell definition, the question is whether the fence serves “a useful purpose.” Under Ferguson, the question is whether the nontres-passory invasion was reasonable. Under either definition, the conclusion should be the same.
¶ 20. The chancellor’s factual determination that the fence “serves no benefit to [the Bazzills] or their property and was erected solely to annoy the Wells [family] ...” is not supported by the evidence. Instead, Green Acres presented evidence to establish that the fence served an important, useful purpose for which Ray (Green Acres) derives a distinct benefit: It insulates Ray from Dan’s malicious threats to his person and property.
¶ 21. For a number of years Ray and the Wellses were cordial neighbors. Ray and Dan would have neighborly visits when Ray approached the Wellses’ property on his daily walks. In 2000, the Bazzills erected a gate to prevent unauthorized vehicles from driving across the property. Also, due to concerns about the high rate of speed of the cars using the road, Ray erected speed bumps on the road for the safety of young children who also live on *1128 the property. Dan objected, and he set one of the speed bumps on fire. When Ray came to put out the fire, Dan threatened to burn down his house the next time.
¶ 22. The evidence also revealed that Dan was injured at work. As a result, Dan began taking prescription painkillers that altered his mood. On one occasion, after previously confronting the Bazzills with an expletive-charged tirade, Dan apologized to the Bazzills for his behavior, stating that his wife had said that he was acting berserk as a result of the medication. Ann admitted on cross-examination that her husband could be violent.
¶ 23. Ray continued to make his daily walks, just as he had been doing throughout the previous decade. When Ray approached the Wellses’ property, Dan would yell angry threats. Avis Hall testified that she witnessed an incident when Dan even threatened to shoot Ray.
¶ 24. After these incidents, Ray began the construction of a fence. Prior to its completion, Ray was building a small rock wall (or a berm) to create structural support for the fence. During its construction, Dan confronted the Bazzills and told them to “build a real tall fence” to separate him from the Bazzills “right here” on the berm. Dan admitted that it was his voice on the tape saying these words. The Bazzills did just that and erected a fence. Thereafter, the threats to Ray diminished significantly. After the petition was filed, Dan threatened to throw Ray into his sewage lagoon.
¶ 25. Hall testified about Dan’s threatening behavior toward the elderly Ray, and she confirmed Ray’s account of the following exchange:
Q. Please describe to the Court what Mr. Wells said to you and Mr. Baz-zill before the fence was put up.
A. Okay. At different times when we would walk, he would come out and holler at a distance to us. He would holler to Mr. Bazzill, he would holler things like, You dirty old man, you better watch your back. And we would usually just keep walking. And he would holler again. There’s times he’s hollered, You dirty SOB, only he used the whole thing. He didn’t say “SOB.” And he would say, I’m going to shoot you in the back, you better watch it, I’m going to get you, I’m going to get you when you least expect it, just saying things like that, continued until we’d get out of earshot.
Q. Would you, please, describe Mr. Wells[’s] behavior when he made these comments?
A. He seemed to be angry.
Q. Okay. How did you feel about the comments or actions that you heard?
A. Scared. It was a little spooky.
Q. Now, let’s move ahead of time. After the fence was put up.
A. Um-hmm. (Yes)
Q. Please describe what Mr. Wells said to you and Mr. Bazzill after the fence was put up.
A. Well, we would hear him holler sometimes when we would go by there, but it’s been a lot less since the fence has been up. But he would holler, Hey, you old man, you know, basically the same things. He would holler that again, just telling him to watch it. I’m going to get you.
Q. Could you observe his behavior when he made these comments?
A. Just from the sound of his voice, you could hear ... I mean, it just *1129 sounded, to me, like it was an angry person that was hollering.
Q. And so just to make sure we’re clear here, the frequency of these statements diminished or decreased after the fence was put up. Is this what you said?
A. Correct. Yes. Yes.
Q. Now, how did you feel about these comments after Mr. Wells put the fence ... I mean after ... I’m sorry ... Mr. Bazzill put the fence up?
A. Well, you don’t feel quite as afraid because, you know, you do have that protection a little bit, feel a little bit protected.
¶ 26. Dan denied making threats but he did not refute Hall’s testimony. Clearly, Hall’s testimony confirmed Green Acres’ claim that the fence should have been deemed both “useful” and “reasonable” since it was designed for protection from Dan’s verbal abuse and threats. I find that the evidence supported only a finding that the fence served a useful purpose, and its erection was reasonable.
¶ 27. Accordingly, I find that the chancellor’s findings were manifestly wrong and were not supported by substantial evidence. Thus, I would reverse and render the chancellor’s judgment directing Green Acres to remove the fence. I respectfully dissent.
BARNES, ROBERTS, CARLTON AND MAXWELL, JJ„ JOIN THIS OPINION.