# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2011-CT-01311-SCT

*TOM CHRISTMAS AND CONSANDRA J.*
*CHRISTMAS*

*v.*

*EXXON MOBIL CORPORATION, A NEW JERSEY*
*CORPORATION*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 06/23/2011 |
| TRIAL JUDGE: | HON. LILLIE BLACKMON SANDERS |
| COURT FROM WHICH APPEALED: | WILKINSON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | WAYNE DOWDY |
| | DUNBAR WATT |
| ATTORNEYS FOR APPELLEE: | JEFFERY P. REYNOLDS |
| | GENE D. BERRY |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE CIRCUIT COURT OF WILKINSON COUNTY IS REINSTATED AND AFFIRMED - 05/15/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1. Tom and Consandra Christmas own property neighboring an alligator-infested, waste-disposal site owned by Exxon. They sued Exxon, claiming the alligator infestation was a nuisance. The circuit court granted summary judgment in favor of Exxon, based on the

statute of limitations and the prior-trespass doctrine. The Court of Appeals reversed and remanded. We find that Exxon is entitled to summary judgment, but for different reasons than those found by the circuit court.

## FACTS AND PROCEDURAL HISTORY

¶2. A waste-disposal site has been located between the towns of Centerville and Woodville in rural Wilkinson County for decades. During the 1980s, 1990s, and early 2000s, the site was owned by Rogers Rental & Landfill Company.[1] From 1984 until 2001, Exxon was the site's only customer and was involved in the site's operations. The extent of Exxon's involvement is disputed. In the early 1980s, Cliff Rogers, the owner of Rogers Rental & Landfill Company, allegedly brought alligators to the site from Louisiana. On July 6, 2001, Exxon purchased the site from Rogers. At Exxon's request, the Mississippi Department of Wildlife, Fisheries, and Parks surveyed Exxon's property on July 2, 2007, and reported the presence of eighty-four alligators. The Department noted that this was "a high density of alligators to exist in the wild." Pursuant to a request from Exxon, the Department removed several alligators from Exxon's property in July 2008.

¶3. On December 3, 2003, Tom and Consandra Christmas purchased a thirty-five-acre tract of land that neighbored Exxon's property.[2] Before they completed their purchase, their real estate agent, Alan Ryan, told them that his horse had been injured on the property and that he suspected an alligator did it. The Christmases also saw a few alligators on their

_____

[1]The site stopped accepting waste in 1997.

[2]The Christmases did not live on their property until approximately August 2007. They moved from their property in February 2008.

2

property from 2003 to 2007. However, they claim they did not know that their property adjoined an alligator-infested, waste-disposal site until 2007 when Mr. Christmas went onto Exxon's property to retrieve one of his dogs.

¶4.    The Christmases sued Exxon on August 11, 2008, alleging that the alligator infestation constituted a nuisance.[3] They did not seek abatement of the nuisance. Rather, they sought monetary damages. Exxon moved for summary judgment, claiming that the statute of limitations had expired, that the Christmases had no recoverable damages, and that it could not be held liable for the presence of wild alligators on its property. The Christmases countered by alleging that the statute of limitations was tolled by the discovery rule, that they could recover for a decrease in their property's value, and that Exxon was responsible for the alligator infestation. The circuit court agreed with Exxon on the statute-of-limitations and damages issues and granted summary judgment in Exxon's favor.

¶5.    On appeal, the Court of Appeals reversed and remanded, finding that there was a factual dispute as to when the Christmases learned of the alligator infestation and that the Christmases' knowledge affected the running of the statute of limitations and the sustainability of their property-damage claim.[4] In its petition for certiorari, Exxon argued that: 1) the statute of limitations was not tolled by the discovery rule and had run before the Christmases filed suit; 2) the prior-trespass doctrine barred the Christmases from recovering

---

[3]The Christmases also accused Exxon of chemically contaminating their property. They abandoned their contamination claim on appeal.

[4]*Christmas v. Exxon Mobil Corp.*, 2013 WL 2302708, *4 (Miss. Ct. App. May 28, 2013). The Court of Appeals did not address Exxon's liability for the alligators. *Id*.

3

for the alligator infestation's effect on their property's value; and 3) it cannot be liable for the presence of wild alligators on its property.

## STANDARD OF REVIEW

¶6.   This Court reviews a grant of summary judgment *de novo*.[5]  Summary judgment is appropriate if "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."[6]  A summary-judgment decision should be based on the pleadings, depositions, interrogatory responses, admissions, and any affidavits, and all evidence must be viewed in the light most favorable to the nonmoving party.[7]

## LAW AND ANALYSIS

¶7.   The Christmases assert one cause of action against Exxon: nuisance.  They allege "[f]or an extended period of time, [Exxon's] property has been infested with large numbers of alligators.  The alligators located on [Exxon's] property are seen frequently near or on the Plaintiffs' property.  Such infestation of alligators constitutes a nuisance."

> A private nuisance is a nontrespassory invasion of another's interest in the use and enjoyment of his property.  One landowner may not use his land so as to unreasonably annoy, inconvenience, or harm others . . . .  One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the

---

[5] *Anglado v. Leaf River Forest Products, Inc.*, 716 So. 2d 543, 547 (Miss. 1998).

[6] *Id.*; *see* Miss. R. Civ. P. 56.

[7] *Prescott v. Leaf River Forest Products, Inc.*, 740 So. 2d 301, 308-09 (Miss. 1999).

4

invasion is either (a) intentional and unreasonable, or (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.[8]

We find the dispositive issue in this case is whether the presence of wild alligators can constitute a private nuisance. Although raised, this issue was not addressed by the circuit court or the Court of Appeals, both of which decided this case based on the statute of limitations and the prior-trespass doctrine.[9]

¶8.     At the outset, we find it important to clarify that this is a wild-alligator case. There is no evidence that Exxon brought the alligators to its property or that it is restraining the alligators in any way. The Christmases claim that alligators were brought to what is now Exxon's property in the early 1980s. The Christmases' accusations are based on the deposition testimony and affidavit of Frederick Coleman, a former employee of Rogers Rental & Landfill Company. The pertinent part of Coleman's affidavit states:

> During my employment at the waste site, I heard and took part in numerous conversations with Exxon employees . . . regarding the alligators that populated the Exxon waste site. It was stated repeatedly by Exxon employees . . . that the alligators had been brought up from Louisiana and introduced to the Exxon waste site.

---

[8] *Leaf River Forest Products, Inc. v. Ferguson*, 662 So. 2d 648, 662 (Miss. 1995) (internal quotations and citations omitted).

[9] The Court of Appeals stated that Exxon did not raise this issue before the trial court and therefore held it could not affirm the circuit court's grant of summary judgment on this ground. *Christmas*, 2013 WL 2302708, at *2 (citing *Byrd v. Woods*, 90 So. 3d 666, 671 (Miss. Ct. App. 2012)). Exxon did timely raise this issue before the circuit court, although the circuit court did not address it. *See* *Briggs v. Benjamin*, 467 So. 2d 932, 934 (Miss. 1985).

5

Despite Coleman's references to "the Exxon waste site," it is undisputed that the property was owned by the Rogers family, not Exxon, for the duration of Coleman's employment. According to Coleman, the original alligators allegedly were brought to the property before Coleman began his employment there in 1984. Additionally, Coleman did not identify Exxon as the party responsible for bringing the alligators to the site. In fact, Mr. Christmas claimed Cliff Rogers, the owner of Rogers Rental & Landfill Company in the 1980s, was responsible for bringing the alligators to the property. Regardless of Coleman's testimony, there is no evidence that the alligators currently on Exxon's property are descended from the alligators allegedly brought to the property by Cliff Rogers. Moreover, the Christmases fail to explain how Exxon can be held liable for Rogers's behavior, which occurred decades before Exxon purchased the property.

¶9. The Christmases' wild-alligator-nuisance claim is a case of first impression in Mississippi. However, other jurisdictions have held that private persons cannot be held liable for the acts of wild animals on their property that are not reduced to possession. *See Sickmen v. United States*, 184 F. 2d 616, 618 (7th Cir. 1950) (stating "a private person could not be held liable for the trespasses of animals which are ferae naturae, and which have not been reduced to possession, but which exist in a state of nature"); *Roberts v. Brewer*, 276 So. 2d 574, 582 (Ala. 1973). We agree.

6

¶10. Alligators are a protected species and are managed exclusively by the Mississippi Department of Wildlife, Fisheries, and Parks.[10] Our Legislature has declared it illegal "for any person to disturb an alligator nest; to buy, sell, take or possess alligator eggs; to buy, sell, hunt, kill, catch, chase, or possess alligators or parts thereof except under permit from the Department."[11] Additionally, the Department narrowly defines what constitutes a "nuisance alligator"[12] and strictly regulates the capture and removal of the same.[13] Consequently, allowing wild alligators to constitute a private nuisance would subject landowners to liability for something over which they have no control. Exxon responded in the only legally permissible way it could to the Christmases' alligator complaints: it called the Mississippi

---

[10] The Mississippi Commission on Wildlife, Fisheries, and Parks is created by Section 49-4-4 of the Mississippi Code. Miss. Code Ann. § 49-4-4 (Rev. 2012). The powers of the Mississippi Department of Wildlife, Fisheries, and Parks are set out in Section 49-4-9 of the Mississippi Code. Miss. Code Ann. § 49-4-9 (Rev. 2012).

[11] Miss. Admin. Code 40-2:5.1.C.1; *see also* Miss. Code Ann. § 49-7-47 (Rev. 2012); Miss. Code Ann. § 49-7-141 (Rev. 2012) (subjecting violators to a fine of $2,000-$5,000 and a mandatory five-day jail sentence).

[12] Generally, a nuisance alligator is one that has shown aggressive behavior, one that hangs around seeking handouts, or one that is in a place it has absolutely no business being, such as a swimming pool or garage or in the middle of the highway. [Mississippi Department of Wildlife, Fisheries, and Parks] also will remove unwanted alligators from private ponds used for aquaculture or recreation. An alligator that has eaten pets or livestock is generally considered to be a nuisance gator.

"The Recovery of the American Alligator in Mississippi," https://www.mdwfp.com/wildlife-hunting/alligator-program/the-recovery-of-the-america n-alligator-in-mississippi.aspx (last visited May 14, 2014).

[13] Miss. Admin. Code 40-2:5.1.

Department of Wildlife, Fisheries, and Parks and asked for the alligator population on its property to be reduced. Therefore, we hold that the presence of wild alligators "not reduced to possession, but which exist in a state of nature" cannot constitute a private nuisance for which a land owner can be held liable.[14] Exxon is entitled to summary judgment.

**CONCLUSION**

¶11.    Tom and Consandra Christmas own property neighboring an alligator-infested, waste-disposal site owned by Exxon. They sued Exxon for nuisance, claiming the alligator infestation decreased the value of their property. The circuit court granted summary judgment in favor of Exxon, finding that the statute of limitations had expired and that the Christmases had no recoverable damages. The Court of Appeals reversed and remanded based on a factual dispute as to when the Christmases had learned of the alligator infestation. We find Exxon is entitled to summary judgment because it cannot be held liable for the presence of wild alligators on its property. For these reasons, we reverse the Court of Appeals' judgment and reinstate and affirm the circuit court's grant of summary judgment in favor of Exxon.

¶12.    **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE CIRCUIT COURT OF WILKINSON COUNTY IS REINSTATED AND AFFIRMED.**

**WALLER, C.J., DICKINSON, P.J., PIERCE AND COLEMAN, JJ., CONCUR. CHANDLER, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, P.J., KITCHENS AND KING, JJ.**

---

[14]***Sickmen***, 184 F. 2d at 618.

8

**CHANDLER, JUSTICE, DISSENTING:**

¶13.    I respectfully dissent. In reviewing the grant of a motion for summary judgment, this Court is required to consider the evidence in the light most favorable to the nonmovants. So considered, the evidence created a genuine issue as to whether the alligators were "wild," as held by the majority, or whether they had been reduced to possession such that Exxon could be liable for maintaining a nuisance. The Court of Appeals correctly reversed the trial court's grant of summary judgment. I would affirm the judgment of the Court of Appeals and remand this case for a trial.

¶14.    This Court applies *de novo* review to the grant or denial of summary judgment. ***Stuart v. Univ. of Miss. Med. Ctr.***, 21 So. 3d 544, 546 (Miss. 2009). We must "review the record before [us] and take all the evidence in the light most favorable to the nonmoving party." ***Id.*** If there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law, we will affirm. ***Id.*** But "[w]hen doubt exists whether there is a fact issue, the non-moving party gets its benefit." ***Ladnier v. Hester***, 98 So. 3d 1025, 1029 (Miss. 2012) (quoting ***Brown v. Credit Ctr., Inc.***, 444 So. 2d 358, 362 (Miss. 1983)). "Issues of fact exist where there is more than one reasonable interpretation that may be given undisputed testimony, and where materially differing but nevertheless reasonable inferences may be drawn from the uncontradicted facts." ***Ladnier***, 98 So. 3d at 1029.

¶15.    "A private nuisance is a nontrespassory invasion of another's interest in the use and enjoyment of his property. One landowner may not use his land so as to unreasonably annoy, inconvenience, or harm others." ***Leaf River Forest Prods., Inc. v. Ferguson***, 662 So. 2d 648,

662 (Miss. 1995). One is liable for a private nuisance when there is "an invasion of another's interest in the private use and enjoyment of land." *Id.* The invasion must be either "intentional and unreasonable," or "unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities." *Id.* (quoting *Comet Delta, Inc. v. Pate Stevedore Co. of Pascagoula, Inc.*, 521 So. 2d 857 (Miss. 1988)). A nuisance may be permanent or temporary in nature, depending upon whether it is capable of abatement. *City of Oxford v. Spears*, 228 Miss. 433, 439, 87 So. 2d 914, 916 (1956). If a nuisance is permanent, the appropriate measure of damages is the diminution in market value of the plaintiffs' property. *Id.*

¶16. The Christmases claimed that the alligators on the neighboring Exxon landfarm constituted a permanent private nuisance, for which they were entitled to the value of the diminution in market value of their property. The majority finds that, because the alligators were "wild animals," they could not constitute a private nuisance as a matter of law. The majority cites authority holding that "a private person [can]not be held liable for the trespasses of animals which are ferae naturae, and which have not been reduced to possession, but which exist in a state of nature." *Sickman v. United States*, 184 F.2d 616, 618 (7th Cir. 1950) (holding that the United States government could not be held liable for crop destruction by wild geese). But the rational extension of this rule is that an individual can be held liable for wild animals when their presence on the property is unnatural – in other words, when animals that naturally occur in the wild have been lured to the property or transported or maintained there by acts of man. *See Commonwealth v. Sadecky*, 398 A. 2d

10

1073, 1075 (1979) (holding that a man-made "haven for rodents is a nuisance in fact"). Such animals can be considered to have been "reduced to possession" by the intentional or negligent acts of the landowner that have caused their presence on the property.

¶17.    A wealth of evidence supported the Christmases' claim that the alligators' appearance at the landfarm was far from a natural occurrence. The landfarm has nineteen ponds designed to contain runoff on the property. Frederick Coleman submitted an affidavit stating that he was employed at Rogers Rental & Landfill Company and worked at the landfarm during the 1980s. Coleman stated that Exxon had been the only waste disposer at the site, and that Exxon "had complete control and ultimate authority for the site." Coleman stated that Tim Tucker, an Exxon employee who worked at the site, stated that alligators had been transported to the landfarm to assist operations because "if the alligators started dying or becoming ill after being exposed to the refinery waste sludge, then this would indicate a possible problem for humans exposed to the toxic waste sludge." Coleman stated that, after their arrival at the landfarm, the alligator population grew, and he "personally observed many, many alligators at the site, ranging from six to ten feet long."

¶18.    In Coleman's deposition, he stated that various animals, including "deer, racoons, peacocks, chickens, ducks, geese, alligators, and rabbits" had been placed at the landfarm for the purpose of monitoring hazardous conditions. In fact, Coleman stated that, during his employment he had watched an informational video explaining this purpose for the animals. He stated that some of the animals had been kept in a shed and that an employee, George

11

Franklin, had been tasked with feeding the animals. He testified that, at that time, each runoff pond contained alligators six to ten feet in length.

¶19. Coleman's testimony established a genuine issue as to whether the alligators were truly "wild," or if they were descended from alligators transported to the landfarm by Rogers or Exxon and allowed to continue as an unnaturally large alligator population thriving in the hospitable environment maintained by Exxon. The majority finds that "there is no evidence that the alligators currently on Exxon's property are descended from the alligators allegedly brought to the property." This finding neglects the rule that this Court must afford the Christmases the benefit of all reasonable inferences favoring their claim. *Ladnier*, 98 So. 3d at 1029. The Mississippi Department of Wildlife, Fisheries and Parks (MDWFP) determined that the alligator population at the landfarm was "a high density to exist in the wild," that the habitat was "favorable to support alligators," and that "the population basically continues to stay near or just above the carrying capacity of the habitat." Considering this evidence, along with Coleman's testimony that the alligators were transported to the landfarm, it is reasonable to infer that the present alligator population is descended from the original population of introduced alligators. The evidence supported the reasonable inference that the alligators were not wild, but had been reduced to possession, having been descended from those artificially introduced to the property by Rogers or Exxon.

¶20. Certainly, the control of alligators is within the jurisdiction of the MDWFP. But, as the Court of Appeals recognized, this fact goes to whether the alligator nuisance is permanent or temporary in nature. As the Court of Appeals astutely recognized:

12

*If a nuisance is abatable, damages for permanent injury are not available. The question of whether the alligator infestation can be abated has not been explored.* However, the record does indicate that at the Christmases' prompting, Exxon requested that the Mississippi Department of Wildlife, Fisheries, and Parks (MDWFP) conduct an alligator census of its property. On July 2, 2007, MDWFP counted approximately eighty-four alligators, essentially one per acre of water, with the caveat that not all may have been counted. Only about sixteen of the observed alligators were four feet or greater in length. At Exxon's request, MDWFP and the Mississippi Department of Environmental Quality (MDEQ) created a harvest plan, whereby alligators of four feet or greater in length would be removed. In July 2008 a MDWFP agent trapper culled seven adult alligators from the property. Exxon had also reinforced its fence along the Christmases' property, apparently to keep alligators from passing under it.

***Christmas v. Exxon Mobile Corp.***, 2013 WL 2302708 n.2 (Miss. Ct. App. May 28, 2013) (citation omitted) (emphasis added).

¶21. Evidence also created genuine issues as to whether the alligators were a nuisance. The Christmases testified that they had two ponds on their property that attracted alligators. While they strongly suspected that these alligators had come from Exxon's property, they never actually witnessed an alligator coming onto their property from Exxon's property. Tom Christmas testified that he saw an alligator try to cross under the fence that separated his property from Exxon's, but that it got stuck and turned around. However, Coleman testified that he had seen alligators leaving Exxon's property. He testified that, on one or two occasions, he had seen an alligator leave Exxon's property and go under the fence onto the Christmases' property, heading for the ponds. Coleman's testimony was supported by the

13

MDWFP's conclusion that "[i]t is reasonable to expect that some alligators may/will disperse successfully from the property to adjacent suitable habitats."[15]

¶22. Little doubt existed that the alligators interfered with the Christmases' use and enjoyment of their property. The Christmases testified that they bought the property in order to build a house. In anticipation of this plan, they cleared some of the property and moved into a trailer near one of the ponds. Consandra Christmas testified that they began seeing alligators during the clearing operations. When they moved into the trailer, they saw alligators in and around the ponds, and she became afraid to go outside. Consandra stated she could not peacefully use her property due to the fear of alligators. Tom Christmas testified that he had lost two calves and one dog and suspected that alligators were responsible. He testified that he was afraid to fish in the ponds due to the alligators. Six months after moving to the property, the Christmases left. Tom testified that:

> My idea was to own a piece of property and have a pond. My wife can go out and fish. We can fish. My grandkids can come up and fish, and we can have a nice recreational area to do it . . . . I can't do that anymore because I would never be comfortable with my grandchild sitting there fishing with alligators coming up anyway. I wouldn't even be comfortable with my wife walking the property knowing there's alligators crawling around out there.

Plainly, the Christmases presented evidence that the alligators interfered with their ability to use and enjoy their land.

---

[15] While the MDWFP's report stated that it would be "virtually impossible" to verify if alligators would disperse to neighboring ponds, the report indicated that such dispersal was a reasonable expectation.

¶23. In conclusion, I note that large numbers of naturally-occurring alligators reside in this state. If a landowner, in violation of Mississippi law, amassed wild alligators or lured them to his or her property, those alligators could not be said to exist in a state of nature, and the landowner certainly could be held liable for creating and maintaining a nuisance. Here, the record is replete with evidence supporting the Christmases' claim that alligators had been introduced to Exxon's property and constituted a nuisance. By concluding that no nuisance could exist because the alligators were "wild," the majority erroneously construes the evidence in the light most favorable to Exxon, not the Christmases. Considering the evidence in the light most favorable to the Christmases, genuine issues of material fact existed for trial. I would affirm the decision of the Court of Appeals reversing the grant of summary judgment and remand for a trial.

**RANDOLPH, P.J., KITCHENS AND KING, JJ., JOIN THIS OPINION**.