CHANDLER, JUSTICE,
dissenting:
¶ 13. I respectfully dissent. In reviewing the grant of a motion for summary judgment, this Court is required to consider the evidence in the light most favorable to the nonmovants. So considered, the evidence created a genuine issue as to whether the alligators were “wild,” as held by the majority, or whether they had been reduced to possession such that Exxon could be liable for maintaining a nuisance. The Court of Appeals correctly reversed the trial court’s grant of summary judgment. I would affirm the judgment of the Court of Appeals and remand this case for a trial.
¶ 14. This Court applies de novo review to the grant or denial of summary judgment. Stuart v. Univ. of Miss. Med. Ctr., 21 So.3d 544, 546 (Miss.2009). We must “review the record before [us] and take all the evidence in the light most favorable to the nonmoving party.” Id. If there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law, we will affirm. Id. But “[w]hen doubt exists whether there is a fact issue, the non-moving party gets its benefit.” Ladnier v. Hester, 98 So.3d 1025, 1029 (Miss.2012) (quoting Brown v. Credit Ctr., Inc., 444 So.2d 358, 362 (Miss.1983)). “Issues of fact exist where there is more than one reasonable interpretation that may be given undisputed testimony, and where materially differing but nevertheless reasonable inferences may be drawn from the uncontradicted facts.” Ladnier, 98 So.3d at 1029.
¶ 15. “A private nuisance is a nontres-passory invasion of another’s interest in the use and enjoyment of his property. One landowner may not use his land so as to unreasonably annoy, inconvenience, or harm others.” Leaf River Forest Prods., Inc. v. Ferguson, 662 So.2d 648, 662 (Miss.1995). One is liable for a private nuisance when there is “an invasion of another’s interest in the private use and enjoyment *129 of land.” Id. The invasion must be either “intentional and unreasonable,” or “unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.” Id. (quoting Comet Delta, Inc. v. Pate Stevedore Co. of Pascagoula, Inc., 521 So.2d 857 (Miss.1988)). A nuisance may be permanent or temporary in nature, depending upon whether it is capable of abatement. City of Oxford v. Spears, 228 Miss. 433, 439, 87 So.2d 914, 916 (1956). If a nuisance is permanent, the appropriate measure of damages is the diminution in market value of the plaintiffs’ property. Id.
¶ 16. The Christmases claimed that the alligators on the neighboring Exxon land-farm constituted a permanent private nuisance, for which they were entitled to the value of the diminution in market value of their property. The majority finds that, because the alligators were “wild animals,” they could not constitute a private nuisance as a matter of law. The majority cites authority holding that “a private person [can]not be held liable for the trespasses of animals which are ferae naturae, and which have not been reduced to possession, but which exist in a state of nature.” Sickman v. United States, 184 F.2d 616, 618 (7th Cir.1950) (holding that the United States government could not be held hable for crop destruction by wild geese). But the rational extension of this rule is that an individual can be held hable for wild animals when their presence on the property is unnatural-in other words, when animals that naturally occur in the wild have been lured to the property or transported or maintained there by acts of man. See Commonwealth v. Sadecky, 41 Pa.Cmwlth. 86, 398 A.2d 1073, 1075 (1979) (holding that a man-made “haven for rodents is a nuisance in fact”). Such animals can be considered to have been “reduced to possession” by the intentional or negligent acts of the landowner that have caused their presence on the property.
¶ 17. A wealth of evidence supported the Christmases’ claim that the alligators’ appearance at the landfarm was far from a natural occurrence. The landfarm has nineteen ponds designed to contain runoff on the property. Frederick Coleman submitted an affidavit stating that he was employed at Rogers Rental & Landfill Company and worked at the landfarm during the 1980s. Coleman stated that Exxon had been the only waste disposer at the site, and that Exxon “had complete control and ultimate authority for the site.” Coleman stated that Tim Tucker, an Exxon employee who worked at the site, stated that alligators had been transported to the landfarm to assist operations because “if the alligators started dying or becoming ill after being exposed to the refinery waste sludge, then this would indicate a possible problem for humans exposed to the toxic waste sludge.” Coleman stated that, after their arrival at the landfarm, the alligator population grew, and he “personally observed many, many alligators at the site, ranging from six to ten feet long.”
¶ 18. In Coleman’s deposition, he stated that various animals, including “deer, racoons, peacocks, chickens, ducks, geese, alligators, and rabbits” had been placed at the landfarm for the purpose of monitoring hazardous conditions. In fact, Coleman stated that, during his employment he had watched an informational video explaining this purpose for the animals. He stated that some of the animals had been kept in a shed and that an employee, George Franklin, had been tasked with feeding the animals. He testified that, at that time, each runoff pond contained alligators six to ten feet in length.
¶ 19. Coleman’s testimony established a genuine issue as to whether the alligators *130 were truly “wild,” or if they were descended from alligators transported to the land-farm by Rogers or Exxon and allowed to continue as an unnaturally large alligator population thriving in the hospitable environment maintained by Exxon. The majority finds that “there is no evidence that the alligators currently on Exxon’s property are descended from the alligators allegedly brought to the property.” This finding neglects the rule that this Court must afford the Christmases the benefit of all reasonable inferences favoring their claim. Ladnier, 98 So.3d at 1029. The Mississippi Department of Wildlife, Fisheries and Parks (MDWFP) determined that the alligator population at the landfarm was “a high density to exist in the wild,” that the habitat was “favorable to support alligators,” and that “the population basically continues to stay near or just above the carrying capacity of the habitat.” Considering this evidence, along with Coleman’s testimony that the alligators were transported to the landfarm, it is reasonable to infer that the present alligator population is descended from the original population of introduced alligators. The evidence supported the reasonable inference that the alligators were not wild, but had been reduced to possession, having been descended from those artificially introduced to the property by Rogers or Exxon.
¶ 20. Certainly, the control of alligators is within the jurisdiction of the MDWFP. But, as the Court of Appeals recognized, this fact goes to whether the alligator nuisance is permanent or temporary in nature. As the Court of Appeals astutely recognized:
If a nuisance is abatable, damages for ;permanent injury are not available. The question of whether the alligator infestation can be abated has not been explored. However, the record does indicate that at the Christmases’ prompting, Exxon requested that the Mississippi Department of Wildlife, Fisheries, and Parks (MDWFP) conduct an alligator census of its property. On July 2, 2007, MDWFP counted approximately eighty-four alligators, essentially one per acre of water, with the caveat that not all may have been counted. Only about sixteen of the observed alligators were four feet or greater in length. At Exxon’s request, MDWFP and the Mississippi Department of Environmental Quality (MDEQ) created a harvest plan, whereby alligators of four feet or greater in length would be removed. In July 2008 a MDWFP agent trapper culled seven adult alligators from the property. Exxon had also reinforced its fence along the Christmases’ property, apparently to keep alligators from passing under it.
Christmas v. Exxon Mobil Corp., 138 So.3d 168, 2013 WL 2302708 n. 2 (Miss.Ct.App. May 28, 2013) (citation omitted) (emphasis added).
¶ 21. Evidence also created genuine issues as to whether the alligators were a nuisance. The Christmases testified that they had two ponds on their property that attracted alligators. While they strongly suspected that these alligators had come from Exxon’s property, they never actually witnessed an alligator coming onto their property from Exxon’s property. Tom Christmas testified that he saw an alligator try to cross under the fence that separated his property from Exxon’s, but that it got stuck and turned around. However, Coleman testified that he had seen alligators leaving Exxon’s property. He testified that, on one or two occasions, he had seen an alligator leave Exxon’s property and go under the fence onto the Christmases’ property, heading for the ponds. Coleman’s testimony was supported by the MDWFP’s conclusion that “[i]t is reasonable to expect that some alligators may/ *131 will disperse successfully from the property to adjacent suitable habitats.”[15]
¶ 22. Little doubt existed that the alligators interfered with the Christmases’ use and enjoyment of their property. The Christmases testified that they bought the property in order to build a house. In anticipation of this plan, they cleared some of the property and moved into a trailer near one of the ponds. Consandra Christmas testified that they began seeing alligators during the clearing operations. When they moved into the trailer, they saw alligators in and around the ponds, and she became afraid to go outside. Consandra stated she could not peacefully use her property due to the fear of alligators. Tom Christmas testified that he had lost two calves and one dog and suspected that alligators were responsible. He testified that he was afraid to fish in the ponds due to the alligators. Six months after moving to the property, the Christmases left. Tom testified that:
My idea was to own a piece of property and have a pond. My wife can go out and fish. We can fish. My grandkids can come up and fish, and we can have a nice recreational area to do it.... I can’t do that anymore because I would never be comfortable with my grandchild sitting there fishing with alligators coming up anyway. I wouldn’t even be comfortable with my wife walking the property knowing there’s alligators crawling around out there.
Plainly, the Christmases presented evidence that the alligators interfered with their ability to use and enjoy their land.
¶ 23. In conclusion, I note that large numbers of naturally-occurring alligators reside in this state. If a landowner, in violation of Mississippi law, amassed wild alligators or lured them to his or her property, those alligators could not be said to exist in a state of nature, and the landowner certainly could be held liable for creating and maintaining a nuisance. Here, the record is replete with evidence supporting the Christmases’ claim that alligators had been introduced to Exxon’s property and constituted a nuisance. By concluding that no nuisance could exist because the alligators were “wild,” the majority erroneously construes the evidence in the light most favorable to Exxon, not the Christmases. Considering the evidence in the light most favorable to the Christmases, genuine issues of material fact existed for trial. I would affirm the decision of the Court of Appeals reversing the grant of summary judgment and remand for a trial.
RANDOLPH, P.J., KITCHENS AND KING, JJ., JOIN THIS OPINION.

. While the MDWFP’s report stated that it would be “virtually impossible" to verify if alligators would disperse to neighboring ponds, the report indicated that such dispersal was a reasonable expectation.